Curtis and Myrtle **BUSSE**, Marcella Busse and Busse Brothers, Inc., Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

No. 73–C–481.

United States District Court,
E. D. Wisconsin.

Sept. 9, 1977.

Paul R. Puerner and Robert A. Schnur, Michael, Best & Friedrich, Milwaukee, Wis., for plaintiffs.

Thomas R. Jones, Asst. U. S. Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

WARREN, District Judge.

This is a suit by three taxpayers, Busse Brothers, Inc., Marcella Busse, and Curtis Busse, to recover income taxes in the total sum of $115,940.25 assessed by the Internal Revenue Service against all three during the calendar years 1968 and 1969. The assessments were made by the IRS on the premise that certain amounts received by the individual taxpayers from Busse Brothers in payment for the transfer of a patent were dividends rather than royalties, that such payments could not be properly deducted by the corporation and constituted ordinary income to the individual taxpayers. The IRS also decided that portions of the payments to the individual defendants were "imputed-interest" under 26 U.S.C. § 483 and as such were ordinary income to these individuals.

All three taxpayers paid the assessments under protest and filed timely claims for refund which were denied. Plaintiffs then filed suit.

The case was tried to the Court January 13–16, 1975. Upon the record therein, the Court does herewith make the following:

## FINDINGS OF FACT

1. Busse Brothers was originally a partnership of Curtis and Gilbert Busse in Randolph, Wisconsin. It engaged in the filling station, auto repair, auto wrecking business, and other similar activities. During World War II the auto wrecking business collapsed and Curtis worked for various area canners while Gilbert was employed as a machinist. In 1946, the brothers reactivated their partnership and began the manufacture and sale of retort crate loaders and unloaders for canning companies. They had two part-time employees. By 1949, the enterprise had grown to the point where it employed 25 people.

2. During the 1950's, the can manufacturing and canning industry was expanding tremendously. The handling, transporting, and storage of the vast quantities of cans involved, led to a great deal of experimentation as the industry sought to mechanize its can handling methods. A general trend developed toward automatic bulk handling with an entire layer of containers on a "pallet" of wood or other material being treated and handled as a single unit. This

required a system for automatically arranging cans on the support structure (palletizing) and also taking the containers off (de-palletizing). Several manufacturing concerns had developed prototypes of automatic can palletizers—but the testimony of representative industry users leads to the inescapable conclusion that competing machines were difficult to sustain in operation and generally unsatisfactory.

3. Standard Knapp Company, a division of Emhardt Corporation had developed a embryonic palletizing device and in the winter of 1956, the Busse Brothers were invited to the Mankato, Minnesota, plant of Green Giant to observe the machine in action. Both brothers felt the standard Knapp equipment was unsatisfactory. Upon returning to Randolph, they conferred with agents of a customer, Continental Can Company, and started developing, in conjunction with Continental Can, a device to do the job.

4. Six weeks of effort were unsuccessful, but the partnership nonetheless advised Continental Can that they were prepared to produce an effective machine for Continental Can.

5. Early discussions indicated that Continental Can was discouraged by these initial failures and not prepared to make it a joint venture whereupon it was agreed that if Curtis and Gilbert Busse could build a machine that worked, Continental Can would buy it. A prototype was thereafter developed, built and demonstrated in a period between 60 and 90 days thereafter. This machine was the embodiment of the claims of the subsequent "Busse patent."

6. The first sale of a Busse palletizer occurred in 1957, and immediately thereafter began a rapid growth of sales and profits by the partnership. Total company sales increased from $355,751 in 1957 to $2,340,385 in 1968 and $2,449,811 in 1969; sales of the palletizer itself from $35,894 in 1957 to $1,233,108 in 1968 and $1,308,810 in 1969. The palletizer success also stimulated the sale of allied products manufactured by the concern.

7. In 1958, Curtis Busse assigned one-half of his invention of the palletizer to his brother Gilbert. A patent was applied for in 1958, and in 1960, the patent involved in this case was issued.

8. The patent (No. 2,949,179) claims covered the palletizer and a U-shaped hydraulic power sweep. They did not cover a de-palletizer nor a variety of systems and devices that were a part of, or utilized with, both the patented palletizer and the non-patented de-palletizer.

9. The palletizing and de-palletizing processes were so interrelated that even though Busse Brothers held no patent on a de-palletizer, the upsurge in sales of palletizers created a comparable growth in sales of de-palletizers, kits and appurtenances.

10. The success of the Busse palletizer did generate a number of competing entries into the field which sought to avoid the protected claims of the Busse machine, but none of these had any significant success in cutting the commanding share of the market for both palletizers and de-palletizers which Busse held. In the years 1957 through 1970, Busse sold 75 percent to 90 percent of the palletizers in use in the nation.

11. Gilbert Busse died in 1962 and his interest in the partnership passed to his wife, Marcella. A new corporation, Busse Brothers, Inc. was formed on January 1, 1966 and some of the partnership assets were contributed to the corporation in exchange for stock. The partnership retained the real estate and certain other assets. On January 13, 1966, the first corporate meeting was held and, among other items of business, the directors authorized the corporation to purchase from Curtis Busse and Marcella Busse their interests in the patent.

12. Extended consultation with counsel and various advisers resulted in the execution on April 28, 1967 of a formal assignment of the patent pursuant to which Curtis and Marcella conveyed all of their respective interests in the patent in consideration of periodic installment payments of 5 percent of the corporation's "net selling price (.....) of palletizers and de-palletiz-

ers (including parts and kits therefor) sold by assignee which are covered by any claim of said Patent No. 2,949,179." The assignment did not establish any down payment nor any minimum payment.

13. After Gilbert Busse's death in 1962, it was necessary to arrive at a value, for tax purposes, of his share of the partnership. After negotiations, it was ultimately agreed between counsel for the estate and the IRS that the total value of the partnership intangibles including both the patent and the good will was $390,000. For estate tax purposes, Gilbert's interest was thus $195,000. For purposes of determining Marcella's 1967 income tax purposes, it was necessary to determine a date-of-death value for Gilbert's patent interest so that the appropriate value could be depreciated over the remaining life of the patent. Again, after negotiations between Marcella's accountant and the IRS, it was agreed that the value of the patent at the time of Gilbert's death was to be established, for income tax purposes, at $240,000 with his share thereof thus set at $120,000.

14. Subsequent to the 1966 agreement to sell the patent (embodied formally in the 1967 Assignment), the corporation continued to enjoy substantial and increasing sales of both palletizers, de-palletizers, and the kits for each. In 1968 and 1969, the following payments were made pursuant to the assignment:

|      | CURTIS | MARCELLA |
|------|--------|----------|
| 1968 | $43,525.92 | $43,525.92 |
| 1969 | $46,993.35 | $46,993.35 |

15. For the years 1968 and 1969, Curtis and Marcella each reported these payments as long-term capital gains. Curtis, as inventor, had no basis and the total of the payments was treated as a long-term gain. Marcella, as a result of negotiations with the IRS, had a basis of $120,000 at the time of Gilbert's death. From then until 1966, she had deducted $27,845.30 thereof. Thus, at the time of the assignment, her basis was $92,154.70, which she then began spreading over the remaining life of the patent. This resulted in an annual deduction of $7,955.80.

16. For the years 1968 and 1969, Busse Brothers, Inc. deducted the installment payments as a deductible amortization of the purchase price. The IRS determined that only 44.5 percent of the installments ($38,-751 in 1968; $41,886 in 1969) constituted "reasonable" payments for the patent and disallowed the balance as a "dividend," hence, non-deductible to the corporation and ordinary income (not long-term capital gain) to Curtis and Marcella.

17. The IRS further determined that of such "reasonable" amounts, the sums of $2,374.51 in 1968 and $3,575.70 in 1969 paid to Curtis and also to Marcella constituted "imputed interest" under Section 483 of the Internal Revenue Code such that although deductible by the corporation, both Curtis and Marcella must have said amounts treated as ordinary income. At the time of trial, the government abandoned this position with regard to the payments made to Curtis. It maintained its contention concerning payments made to Marcella.

18. The IRS also determined that $6,659.18 of the 1969 installment payments to Marcella should be treated as "depreciation recapture" to her under Section 1245 of the Internal Revenue Code. This would make it ordinary income to her. Marcella Busse has conceded this issue and it need not be further addressed by the Court except as it may affect the judgment to be rendered herein.

## CONCLUSIONS OF LAW

Thus, the ultimate issues presented to the Court in the bench trial are essentially, (A) whether or not the 1968 and 1969 installment payments made to Curtis Busse and to Marcella Busse were "reasonable" so as to make the sale of the patent to the corporations deductible to the corporation and eligible for capital gains treatment to the taxpayers, and (B) whether or not the 1968 and 1969 payments to Marcella are subject to the "imputed interest" requirements of 26 U.S.C. § 483(f)(4) such that a portion of the payment to Marcella in each years would be ordinary income to her. As to all other issues originally in the case, one side or the other has conceded.

## A. "REASONABLENESS"

■ As a general backdrop to this opinion, the Court would note and generally agree with the government that transactions of tax significance between a taxpayer and his closely held or controlled corporation are to be viewed with close scrutiny so as to avoid abuse of the tax laws. However, it is equally true that sanctions or implication of wrongdoing should not attach to a citizen who arranges his affairs so as to minimize the tax impact. In fact, as plaintiff notes in a footnote of his brief, it is clear that when it comes to the tax treatment of patent sales, there is an affirmative public policy to encourage invention through favorable tax provisions.

■ In dealing with taxpayers and their controlled corporations whether or not a given transaction is what it appears to be—or whether it is a masked scheme to distribute corporate earnings under artificial tax devices must be judged by what is "reasonable," *Merrit v. Commissioner*, 39 T.C. 257 (1962), and that ubiquitous term is deemed to be what an unrelated party would have paid under the same or similar circumstances. What the naked terms of the contract call for does not determine the issue for the Court.

It seems abundantly clear that this particular transaction does not fall within the purview of 26 U.S.C. § 1235 which implements Congressional intent to give inventors and certain financial backers capital gains treatment on patent sales even though the asset is not held for six months. Curtis Busse was the inventor; Marcella was not. But, the transfer was to a corporation in which each owned more than 25 percent of the stock. The transfer could not qualify under § 1235. Nonetheless, the patent was held by Curtis and Marcella Busse more than six months and transferred to a corporation in which each held less than 80 percent of the stock. Hence, although not qualifying under § 1235, the sale was nonetheless entitled to long-term capital gains treatment under the general provisions applicable to the sale or transfer of any capital asset. 26 U.S.C. § 1239 (assum-

ing the payments pursuant to the sale were not disguised dividends).

Despite the fact that § 1235 does not govern the transaction its content and legislative history were frequently referred to in the arguments on the issue of "reasonableness."

In its brief the government attacks the formula of the sale contract which measured the sale price of the patent by 5 percent of the sales of palletizers *and* de-palletizers (as well as kits and appurtenances). It argues that 26 U.S.C. § 1235 permits the transfer of the patent to be treated as a long-term capital gain even when the payments in consideration of such transfer are:

. . . contingent on the productivity, use, or disposition of the <u>property transferred</u>. (underlining by government).

■ Arguing that long-term capital gains treatment for a patent sale under § 1239 should not be any more favorable than it would be under § 1235, if applicable, the government takes the position that the patent was the property transferred and that there is something inherently wrong with the transaction because the sale price is determined by the sales of both palletizers and de-palletizers. In fact, the government's evaluation expert opined that different markets exist for the two kinds of machines and that since the patent covered only the palletizers, it was unreasonable to measure the patent price by the sales of both devices. Counsel for defendant regards the wording quoted above from § 1235 as a limitation requiring that capital gains treatment can only be extended when the payments are contingent on the productivity of the patent itself and cannot be measured by the productivity of non-patented items. The Court finds a number of faults with this argument. It overlooks the wording of § 1235(a) which applies capital gains treatment (when certain conditions are met), *regardless of whether or not* payments in consideration of such transfer are . . . (1) payable periodically . . . or (2) contingent on the productivity . . . (emphasis supplied). Additionally, it is the Court's opinion that the term "productivi-

ty" is broad enough to cover the profits from sales of both palletizers and de-palletizers because of the proven close relationship between the two. Finally, the Court notes the parallel which can be drawn to the "entire market value rule" from the realm of patent law, permitting recovery based on the value of an entire mechanism containing a variety of features only one of which is patented.

The evidence shows that the invention of the palletizer seems to have immediately created a market for de-palletizers. Although any given purchaser of palletizers would not require an equal number of de-palletizers, the record establishes that the technologies of the two devices were so much alike that palletizer purchasers frequently drew upon the engineering sales service of Busse in solving their own or their customers' de-palletizing problems; that palletizer buyers did in fact purchase large numbers of Busse de-palletizers; and that the invention of the palletizer created immediate and substantial sales of de-palletizers by Busse.

Nor is the Court aware of any rules of law, custom or usage requiring that the measure of a sale price can be only the sale of patented devices.

The owner of the monopolistic property right granted under a patent who for some reason transfers that interest would be influenced by so many factors that the judgment as to what is a reasonable price becomes highly subjective and tailored to the specifics of the situation. Mr. Reak testified regarding the newspaper stacker where the royalties were 55 percent on the first five units; 28 percent on units 6 through 15; 14 percent on 16 through 25; 10 percent on units 26 through 125; 7 percent on units 126 through 225; and 5 percent on the balance. That unique formula was tailored to the realities of that situation.

Many of the factors that must perforce be considered were discussed by the experts for each party during their testimony. The strength of the patent, industry rates, saturation of the market, exclusivity of the sales, comparables, contribution of the pat-ented product to other sales, and profitability of the patent after making the payments were all covered in testimony and in extensive briefs.

The government points to the language on page 2 of the assignment calling for the payment of 5 percent of the selling price of "palletizers and de-palletizers . . . which are covered by any claim of said Patent" as an ambiguity that should be construed in favor of the defendants' interpretation since the drafter stands on both sides of the bargain in this instance. That argument appears inapplicable to the Court. We are here concerned not with construing the language of an ambiguous contract to establish the rights of the parties, but rather with deciding whether the terms of a clear contract (which may well be factually inaccurate inasmuch as the de-palletizers were not covered by the patent) which has been interpreted in the same way by both parties, is in fact "reasonable" from the point of view of a third party, i. e., the government.

The contention by defendant that the assignment formula, tying the royalty rate to sales of palletizers *and* the non-patented de-palletizers, raises the possibility of patent misuse or antitrust violations is not convincing to the Court. Misuse of patent and antitrust laws focus on impairing the operation of the free market place and the lessening of competition. Here the monopoly enjoyed by the owner is government created and government sanctioned. The measure of the price for the patent, i. e., sales of palletizers *and* de-palletizers was not forced upon an unwilling purchaser who had to buy A and B to get A; nor was competition in the de-palletizer market affected in any way by this assignment. The *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) and *Glen Mfg., Inc. v. Perfect Fit Industries, Inc.,* 324 F.Supp. 1133 (S.D.N.Y.1971) cases cited by defendant, and *Zenith Corp. v. Hazeltine,* 395 U.S. 100, at p. 133, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) convince the Court that while patentees do not have carte blanche authority

to condition the grant of patent licenses upon the payment of royalties on unpatented articles, neither is it *per se* a misuse of patents to measure the consideration by a percentage of the sales of items covered by the patent and not covered by the patent. Under the facts of this case, the Court cannot find patent misuse or antitrust implications. This finding is buttressed by the realization that the resolution of this issue takes us no closer to the crucial question of the case at bar . . . where the amounts paid under the assignment were such that they were unreasonable and were really dividends in disguise.

■ After consideration of the full record, the Court is satisfied that the Busse patent was strong; that it was not successfully avoided by competitors; that the transfer was a sale of what amounted to an exclusive license for a substantial remaining patent life; that the development of the patented product had an immediate and sustained positive impact on the total sales of the company, and that when the rule of thumb which both sides appeared to agree upon (25 to 33 percent of "profits") is applied against the gross profit of sales of palletizers *and* de-palletizers, the payments were "reasonable."

The valuation placed upon the one-half interest in the patent in Gilbert's estate in 1966 is urged by the government as constituting a frozen figure which should estop the taxpayer from asserting any other value insofar as the reasonableness of the sale is concerned. This value was established arbitrarily, and primarily as a compromise in the preparation of Marcella's income tax returns, at $120,000 for Gilbert's one-half of the patent. Then, using this value, the government seeks to calculate a "reasonable flow of income for that assumed value pursuant to the reverse application of Haskold's Formula. The Court can perceive of no rationale that warrants this procedure and justifies holding the taxpayer who has sold under a contingent percentage of sales formula to the rigidities of a figure born in negotiation or to a valuation formulary that pre-supposes equal annual installments.

The Court found the terms of the Canadian licensing agreement (5 percent of sales of palletizers and de-palletizers), an admitted arm's length transaction, much more persuasive on the issue of reasonableness. To be sure it was a license to manufacture and not a sale of all patent rights. The fact that it also covers the manufacture of unpatented crate unloaders is offset by the fact that the license also provided for exchange of manufacturing "know-how." It is highly probative, it appears to the Court, as to reasonableness.

## B. "IMPUTED INTEREST"

■ Both the Tax Court and the Seventh Circuit Court of Appeals looked at the relationship between 26 U.S.C. § 1235 and 26 U.S.C. § 483(f)(4) in the predecessor case of *Busse v. Commissioner*, 58 T.C. 389 (1972), affirmed 479 F.2d 1147 (7th Cir. 1973). The question there was: Given a patent transfer which is described in § 1235(a) of the Code, but which does not receive its capital gain treatment under § 1235 because of the prohibition of (d) thereof, should some part of the payments received pursuant thereto be treated as unstated (imputed) interest under § 483 or is such treatment precluded by the exception contained in § 483(f)(4) which reads:

> *Sales or Exchanges of Patents* This section shall not apply to any payments made pursuant to a transfer described in section 1235(a) (relating to sale or exchange of patents).

The Tax Court held that such payments do qualify for the statutory exception. The Court of Appeals held that the wording of the statute was not ambiguous and that there was nothing in the legislative policy that should prevent giving effect to the plain language of § 483(f)(4). Curtis Busse was the original inventor and the favorable tax treatment established by the Congress should flow to his benefit. None of the payments to him were held to constitute imputed interest.

In its argument to the Seventh Circuit Court of Appeals, the Commissioner cited two "anomalous situations" as justification

for his argument that the plain language of § 483(f)(4) led to absurd results:

1. He assumed that Congress created a favored class of taxpayers in enacting § 1235 and that the exception of § 483(f)(4) was a "benefit essentially ancillary to the benefits provided by § 1235." He was disturbed that the taxpayer would be obtaining the benefits of § 483(f)(4) when he was not really a member of the favored class because he didn't qualify under § 1235(d).

2. The second example of an "anomalous" situation cited by the Commissioners—and the response thereto by the Seventh Circuit Court are instructive in the issue at bar. The Commissioner noted that the word "holder" in § 1235(a) is defined in subsection (b). Curtis Busse qualified as a "holder" because he created the property the invention. The Commissioner pointed out that subsection (b)(2)(B) makes eligibility for holder status by persons other than "creators" turn on their not being related to the creator within the meaning of subsection (d). Thus, contended the Commissioner, should Busse Bros., Inc. assign the patent rights to a third party at some future time, that third party might not claim the benefit of § 483(f)(4) even if, as Curtis Busse, it could qualify the transfer for capital gains treatment under § 1221 and 1222.

The Court of Appeals, at p. 1152, appears to agree with the Commissioner's analysis of the interrelationship of the words and phrases within § 1235 and between § 1235 and § 483(f)(4); *i. e.*, "Sec. 1235-type transactions disqualified because of an unauthorized 'transfer' would not be subject to imputed interest, but Section 1235-type transactions disqualified because of failure to meet the definition of 'holder' would be so subject." It noted, however, that although such a disparate result might well offend the Commissioner's sense of symmetry and propriety . . . "*we cannot say the results it causes are either absurd or unintended by Congress.* (emphasis added) It further opined that neither the courts, nor the Commissioner in his capacity as an administrative official, had the power to rewrite legislative enactments to give effort to their ideas of proper policy or in order to provide symmetry in the laws. The Court concluded that the statutory language meant what it said; that the taxpayers 1966 assignment to the corporation was "a transfer described in § 1235(a)."

Here plaintiffs contend that the issue is whether the 1966 transfer was one described in § 1235(a); that that issue was resolved by the Seventh Circuit Court in its opinion regarding Curtis; that § 1235(b) explicitly states that its limited definition of "holder" is set forth *for purposes of this section* and that it thus does not limit § 483(f)(4); and finally that § 483 was not meant to apply to patent transfers at all or at least not to patent transfers where the consideration is contingent upon future sales because there can be no hidden interest factors in such transactions. Reliance is placed on *Goldman v. United States*, 74–1226 (E.D.La.) reported at 74–2 CCH, U.S. Tax Cases ¶ 9723 for the proposition that all receipts from the sale of patent rights:

. . . are exempt from the interest imputation provisions because of 483(f)(4) and 1235(a)'s broad phrasing. Some are also entitled to capital gains treatment by virtue of 1235 and other sections of the Code. But the two determinations are not interdependent.

The government asserts that following the opinions of the Tax Court and the Seventh Circuit Court of Appeals leads to the conclusion that the payments to Marcella must be subject to the imputation of interest; that the interest imputation exception in § 483(f)(4) is not applicable to all payments made under a patent transfer because § 1235(a) provides that the transfer must be by a "holder" as that term is defined in 1235(b); that Marcella Busse could not be a "holder" and hence could not take advantage of § 483(f)(4).

In resolving this conflict, the Court is impressed with the strong admonition of the Seventh Circuit Court that statutes must be interpreted so as to effectuate

**936**

their plain meaning. Neither the courts nor administrative agencies can usurp the legislative function merely to serve the ends of intellectual balance or neatness. It may well be as plaintiffs argue that there is no "hidden interest" factor present when patents are transferred for a consideration dependent on uncertain future sales . . and that symmetry in logic calls for this principal to overcome the need for interest imputation as to both an original inventor *and* a subsequent transferor regardless of whether or not that transfer and transferor meet all of the requirements of § 1235.

But, that is not what the statute says. The exception to imputed interest in § 483(f)(4) applies to "a transfer described in § 1235(a)" and the transfer described in § 1235(a) is a transfer by, among other things, a "holder" which is defined, for purposes of section 1235 by 1235(b), Marcella Busse cannot meet the definition of a "holder."

It strikes the Court that by enacting section 1235, the Congress chose to create a favored group of taxpayers—those who created inventions; that to foster invention this group, defined as it was, could transfer inventions and take capital gains treatment thereon, regardless of whether the transfer qualified under § 1221 or § 1222 or not.

In § 483, Congress sought to get at the general problem arising where transfers of any sort were made with deferred payments and there was no interest or inadequate interest expressed. In such cases, § 483 imputes appropriate interest. In its wisdom, Congress saw fit to not apply this policy to "payments made pursuant to a transfer described in section 1235(a)." As plaintiffs assert logical symmetry might well call for this exception to be applied to all patent transfers, or at least, to all patent transfers where the payments are shaped by uncertain future productivity. But, again, that is not what the statute says. It limits the exemption to those transfers "described in § 1235(a) . . . ." and any transfer under § 1235(a) must be by a "holder." The Court cannot agree with the statement in *Goldman v. United States, su-*

*pra,* that "the two determinations are not interdependent."

The reasoning of the Seventh Circuit Court of Appeals requires the application of the clear language of the payments to Marcella Busse in the years 1968 and 1969, pursuant to 26 U.S.C. § 483.

In summary, the Court resolves the issue as to "reasonableness" against the government and as to "imputed interest" against the taxpayer, Marcella Busse.

Because certain of the issues have been disposed of by action of the parties and others by this memorandum, and because the various resolutions require computation as to the financial result, it is ORDERED that the parties within thirty (30) days, present to the Court an agreed computation embodying resolutions of all issues as made herein.

SO ORDERED.