RAYMOND R. AND JANE BELKNAP, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Belknap v. Commissioner
Docket Nos. 5677-87; 5710-87; 6058-87.
United States Tax Court
T.C. Memo 1989-210; 1989 Tax Ct. Memo LEXIS 210; 57 T.C.M. (CCH) 301; T.C.M. (RIA) 89210; May 2, 1989. John D. Copeland and Andrea Winters, for the petitioners. Martin Van Brauman, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Addition to Tax Under Section
Petitioner
Year Ended
Deficiency
6653(a)(1) [2]
6653(a)(2)
6661
Belknap
12/31/82
$  45,604.50
$ 2,280.28
*
$ 11,401.00
12/31/83
60,353.00
3,017.65
*
13,963.25
12/31/84
66,966.00
3,348.30
*
16,741.50
Snap-Drape
09/30/83
164,551.00
--
--
41,137.75
09/30/84
185,324.00
--
--
46,331.00
Guebert
12/31/82
46,893.50
2,344.68
*
11,723.25
12/31/83
58,142.50
2,907.13
*
13,246.50
12/31/84
66,391.00
3,319.55
*
14,283.00
*211 After concessions, the only issue is whether certain payments by Snap-Drape, Inc. (SDI) to Raymond R. Belknap (Belknap) and Gerald E. Guebert (Guebert) were reasonable royalties for the use of a patent or whether portions of the payments should be recharacterized as dividends. The notices of deficiency treated the entire amount of the payments as dividends, leaving Belknap and Guebert with a zero royalty rate on their patent. After respondent's own expert determined that a portion of the payments were reasonable royalties, respondent changed his position. Respondent now wishes to recharacterize only a portion of the payments as dividends. FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petitions were filed, the Belknaps were residents of Austin, Texas, the Gueberts were residents of Dallas, Texas and *212 SDI was located in Carrollton, Texas. Tables used for food service or display at a meeting, banquet, luncheon or similar function typically are covered both with a table cloth and with skirting which hangs from the table edge to the floor. Until the early 1970's, the skirting usually was attached to the table cloth with straight pins or to the table with stapling. Pinning was a very time consuming and painful process. Stapling damaged the fabric and the table and would not work on tables with metal edges. In 1971 or 1972, Belknap and Guebert developed the Snap-Drape system, which attaches the skirting to the tables with plastic clips. The Snap-Drape system was both quicker and less damaging than the old methods and, accordingly, was a very attractive product which substantially reduced the costs of draping tables. It was well received by the hotel, restaurant, banquet and convention trade. On September 16, 1975, Belknap and Guebert were issued U.S. Patent No. 3,905,414 (the first patent) on the original Snap-Drape system. Belknap and Guebert began promoting the Snap-Drape system immediately after it had been developed. Initially, this was a part-time activity but soon it *213 became full time. In October 1974, they formed SDI, a sales company for the Snap-Drape system. Belknap and Guebert each owned 50 percent of the SDI stock. SDI's taxable year ends on September 30. On March 18, 1975, Belknap and Guebert executed an agreement acknowledging themselves as the joint inventors and owners of the first patent. On that same date, Belknap and Guebert granted SDI an exclusive license to make, use and sell items using the first patent. Two days later, the license was amended to provide for a royalty of 7 percent on the first $ 100,000 of annual gross sales of the licensed product, 6 percent on the next $ 100,000 of annual gross sales and 5 percent on all remaining annual gross sales. In 1976, a dispute arose between Belknap, Guebert and SDI over how the business should be run. The litigation was settled pursuant to an agreement under which Belknap and Guebert would each own 49 percent of SDI stock, with the other 2 percent held by Hugh Pettibone, an employee. Pettibone's stock was nonvoting. Pettibone resigned as an employee and officer shortly thereafter. He had no further role in the business but held his shares through the years in issue. On December 9, 1980, Belknap *214 and Guebert were issued Patent No. 4,237,958 (the second patent) for new attachment devices which would fit a wider variety of tables and also portable stages. Later, Belknap and Guebert developed a system of prefabricated skirting that would form backdrops and borders in portable displays in trade shows and conventions. This system required a new attachment device which would attach skirting to tubular rods. On July 22, 1980, Belknap and Guebert were issued Patent No. 4,213,492 (the third patent) for this device. Belknap and Guebert also developed a storage system for skirting which involved portable racks and specially designed hanger bars. In 1980, they obtained a Design Patent (the design patent) on the special hanger bar used in the storage system. On May 1, 1979, the first patent was reissued to Belknap and Guebert as Patent No. Re. 29,979 (the reissued patent). The reissued patent contained certain corrections and expanded claims. SDI initially marketed the items not covered by the first patent pursuant to an informal arrangement to pay royalties under the original license agreement. This arrangement continued until October 22, 1981, when Belknap and Guebert entered *215 into a second exclusive license agreement with SDI. This agreement provided that the original license agreement would continue in full force and effect, and also that SDI had the exclusive right to make, use and sell items which used any of the patents. In return, Belknap and Guebert would receive royalty payments of 10 percent of the invoice price of all the licensed products. SDI bought the plastic clips, storage systems, draping materials and other components of the Snap-Drape system from independent contractors. Accordingly, SDI's capital requirements were minimal. Due to the attractiveness of the product, SDI has been very profitable over the years. The following tables show the compensation, royalties and retirement benefits received by Belknap and Guebert from SDI or a related company called Skirting Fabricators (Skirting), which produced the skirting. Ray Belknap
Estimated
Taxable
Skirting
Management
Retirement
Year
SDI Salary
Salary
Royalty
Fee
Benefits
Total
1975
--
$   1,000
$   6,043
--
--
$   7,043
1976
$ 14,550
12,900
10,793
--
--
38,243
1977
24,000
37,500
20,197
--
$  3,600
85,297
1978
24,000
50,000
18,598
--
3,600
96,198
1979
46,000
39,000
10,770
--
3,600
99,370
1980
24,000
66,400
46,861
--
3,600
140,861
1981
24,000
74,515
58,226
--
3,600
160,341
1982
24,000
53,000
152,621
--
40,000
269,621
1983
24,000
90,000
184,588
--
40,000
338,588
1984
24,000
108,000
202,230
$ 2,500
40,000
376,730
*216 Gerald Guebert
Estimated
Taxable
SDI
SDI Sales
Management
Retirement
Year
Salary
Commission
Royalty
Fee
Benefits
Total
1975
$ 14,400
--
$   6,043
--
--
$  20,443
1976
18,474
--
10,793
--
--
29,267
1977
42,032
--
20,197
--
$  3,600
65,829
1978
32,855
--
17,530
--
3,600
53,985
1979
46,000
$ 13,721
37,049
--
3,600
100,370
1980
50,000
17,412
46,861
--
3,600
117,873
1981
24,000
36,880
56,726
--
3,600
121,206
1982
24,000
19,376
152,621
--
10,000
205,997
1983
24,000
36,404
184,588
--
10,000
254,992
1984
24,000
54,556
202,230
$ 2,500
10,000
293,286
Competitors have attempted to design a system which would perform the same functions as the Snap-Drape products without infringing on the Snap-Drape patents. However, the Snap-Drape system remains the top seller in its product line, accounting for two-thirds to 80 percent of all sales in the field. The following table shows various financial data for SDI: Year
Gross
Taxable
S-H
% Return
Total
Ending
Receipts
Income
Equity
On Equity
Assets
9/30/75
$   184,767
$  6,447
$   7,447
86%
$  55,562
9/30/76
507,843
51,120
45,195
113%
106,594
9/30/77
789,294
12,043
55,939
21%
170,249
9/30/78
1,134,267
9,151
65,090
14%
208,904
9/30/79
1,621,172
99,123
128,069
77%
324,428
9/30/80
1,787,587
62,009
172,105
36%
475,969
9/30/81
2,191,259
80,367
205,795
39%
555,349
9/30/82
3,023,900
20,917
247,234
8%
703,213
9/30/83
3,671,350
51,438
292,191
18%
823,432
9/30/84
3,996,914
87,856
353,236
25%
823,173
*217 Gross
Year
% Return
Gross
Profit
Royalties
Ending
On Assets
Profits
Margin
Paid
9/30/75
11%
$    81,456
44%
$  12,086
9/30/76
48%
245,597
48%
28,416
9/30/77
7%
341,014
43%
40,393
9/30/78
4%
488,002
43%
52,905
9/30/79
30%
782,152
48%
74,528
9/30/80
13%
864,203
48%
93,290
9/30/81
14%
1,026,434
47%
114,952
9/30/82
3%
1,316,245
44%
305,243
9/30/83
6%
1,641,948
45%
369,176
9/30/84
11%
1,871,916
47%
404,461
OPINION The only issue in this case is whether the royalty payments of 10 percent of gross receipts were reasonable under the circumstances or whether a portion of those payments should be recharacterized as dividends. The parties agree that section 1235 does not apply to the facts of the instant case. The parties also agree that to the extent the royalty payments were reasonable they were capital gains to the individual petitioners and they may be amortized or depreciated by SDI. Busse v. United States,437 F. Supp. 928 (E.D. Wis. 1977); Merritt v. Commissioner,39 T.C. 257, 270 (1962), *218 revd. on another issue sub nom. Paragon Jewel Coal Co. v. Commissioner,330 F.2d 161 (4th Cir. 1964), revd. 380 U.S. 624 (1965); Merck & Co. v. Smith,261 F.2d 162, 164 (3d Cir. 1958). The parties likewise agree that to the extent the royalty payments should be recharacterized as dividends, they were ordinary income to the individual petitioners and they may not be amortized or depreciated by SDI. The royalty payments were reasonable if they would have been agreed upon by unrelated parties dealing at arm's length under the same circumstances. Merritt v. Commissioner, supra at 270. Both respondent and petitioner presented expert witnesses on the subject of the reasonableness of the royalty payments. Respondent's expert report was prepared by Marshall and Stevens Incorporated (MSI). The Project Manager for the report was John A. Thomson (Thomson), who is a member of the American Society of Appraisers. Bryan D. Goetz and Gary L. Schroeder assisted Thomson with the report. All three have significant appraisal experience. MSI used four techniques for determining a reasonable royalty on the patents. First, it *219 calculated a royalty which would just compensate the inventors for their actual cost of developing the patent. According to MSI, this was 0.655 percent of gross receipts. Second, MSI calculated a royalty which would equal the total net profits of SDI (before any royalties were paid) for the years 1975 through 1984. According to MSI, this was 10.32 percent of gross receipts. Third, MSI looked at "rates prevalent in the industry." Referring to an article in a publication called "Les Nouvelles," the MSI report said that the most common royalty rate encountered over all industries "has been a 5 to 6 percent rate based upon the net sales price of each item sold." MSI also reported that the California Technology Institute, which licenses inventor's intellectual property, "considers a 5 percent royalty based on net sales of each unit sold as desirable. The Institute notes that the rate is generally lower when the product is mass produced and correspondingly higher when the product is an expensive limited production item." [3]MSI concludes that this technique suggests a royalty rate no higher than 5 percent of net sales (essentially gross receipts). *220 Fourth, MSI viewed "the royalty negotiation as a means for seeking reasonable division of profits anticipated by the licensed parties." Thomson testified that the licensee should get more than half of net profits because it takes the risks and invests money for production, it has to hire and be responsible for employees, and it has to do advertising and marketing. The MSI report cites several articles which state essentially the same thing. For example, an article in "Les Nouvelles" states that since "the licensor is to receive the dividend of profit merely through the furnishing of technology without investment, its profit should naturally be smaller than the profit to be gained by the licensee which takes the risk of investment." The MSI report concludes that a reasonable royalty range is 25 to 50 percent of net profits. MSI rounded its calculation of net profits to 10 percent, and from this calculated an appropriate royalty range (after taxes are taken into account) of 1.8 to 3.1 percent. According to MSI, the first two techniques were used to set a reasonable range of royalties. The third technique was used to suggest a reasonable royalty rate within that range. The fourth *221 set a number that would allow a reasonable profit to each party. MSI then "fine tuned" the royalty by considering various factors such as the license's duration and scope and decided that a reasonable royalty rate "would tend to be on the high side of the range of intermediate royalty rates which was 1.8 to 3.1 percent of gross sales." MSI concluded that a reasonable royalty rate under the October 1981 agreement equalled 3.0 percent of gross receipts. Petitioner presented two expert witnesses. Respondent objected to the testimony of both witnesses on the ground that their expert witness reports did not set forth in detail the reasons for their conclusions. However, their testimony did not go materially beyond their reports and should not have prejudiced or surprised respondent. We found their opinions to be helpful. One expert witness was Edward G. Fiorito (Fiorito), a patent lawyer who had no relationship with petitioners. He has personally been engaged in over 100 negotiations for licensing agreements in his practice as a patent attorney. He said that in the instant case a royalty rate as high as 20 percent of gross receipts could be reasonable, and if he had been representing *222 SDI he would have recommended that it be willing to pay a 10-percent royalty. Fiorito testified that a rule of thumb is that one-third of profits should go to the licensor. He agreed with MSI that the usual rationale for the rule is that the licensee is going to make a large investment in capital and will assume the risks associated with the exploitation and commercialization of the product and, thus, should receive more than half of the profits. He testified, however, that the profits that are divided up generally are gross profits, which equal gross receipts minus the cost of goods purchased from other sources. Since gross profits in the instant case varied between 43 and 48 percent, the rule of thumb would give a royalty around 15 percent. On cross-examination, he admitted that he did not know that a 15-percent royalty rate would have caused SDI to lose money. However, he still felt that a reasonable royalty rate could have been as high as 15 percent because SDI could have increased its prices to cover the higher royalty rate. The other expert witness was Stanley Allen Self (Self), a business professor at Texas Christian University. Self teaches valuation in his courses and *223 has appraised property. He testified that for several reasons a royalty rate higher than 10 percent of gross receipts could be justified. First, the goods sold were purchased from a third party, so the profits made in the manufacturing process already had been excluded from the gross profits figure. Second, SDI prices were not as high as those typically set by a monopoly and, thus, SDI could have raised its prices to maintain its profits. Third, after the royalty rate went to 10 percent, SDI "continued to have good return on assets, good return on equity, and they even had a magnificent year [taxable year ending in 1986] where * * * they showed taxable income of $ 405,000, and this is on a beginning investment of $ 1,000, and that ain't bad." Self testified that he would be satisfied with such a return in any business of his own. Self concluded that SDI's decision to pay a 10-percent royalty rate was a rational business decision. As a rebuttal witness to the MSI report, petitioner called William David Harris, Jr., a patent lawyer. He said that respondent's report did not take into consideration "the facts of life and what a reasonable royalty really is or how a royalty is *224 negotiated." He said that "3 percent is a ridiculously low royalty for this product." He thought that the MSI report was deficient because it did not take into account the low amount of capital put into SDI and SDI's high financial returns. He noted that SDI did very well despite the 10-percent royalty payments. We agree with petitioners' experts that the MSI report is flawed. Although the MSI report discusses four different valuation techniques, there is no evidence that the first three techniques had any effect upon MSI's conclusion. On cross-examination, Thomson admitted that the first technique (the cost approach) is seldom given any credibility when valuing a patent and the MSI report did not use that approach at all when arriving at the royalty rate. Thomson also admitted that the third technique (royalty rates in other industries) is inapplicable in this case. His testimony did not mention whether MSI used the second technique (the licensee's total net profits), but there is no evidence it did. MSI's final range of royalty rates (1.8 to 3.1 percent) is identical to the range derived by the fourth technique (division of net profits). MSI's fourth technique was based *225 upon a rule of thumb that 25 to 50 percent of net profits should be paid to the licensor. According to Thomson, the reason for the rule of thumb is that the licensee takes the risks and invests money for production, it has to hire and be responsible for employees, and it has to do advertising and marketing. Thomson's reasoning does not fully apply to the facts of the instant case. SDI contracted with other companies to produce the product rather than investing its own money in production, and SDI's inventory was relatively small. In addition, a substantial portion of the compensation paid by SDI was in the form of commissions rather than in the form of salaries so any reduction in sales would have been accompanied by a reduction in compensation. Finally, SDI's advertising and marketing expenses were not substantial long-term commitments. We conclude that SDI, as a sales company, bore much less risk and required much less investment than a manufacturing company of similar size. Accordingly, we believe that the rationale for paying the licensee over half of net profits does not apply in the instant case. MSI put much emphasis upon rules of thumb found in magazine articles. We *226 believe it should have placed more emphasis upon the economic factors which will determine the outcome of licensing negotiations. As Self pointed out, SDI did very well financially even when it was paying a 10-percent royalty. We believe that SDI's actual performance was reasonably foreseeable, and respondent does not argue to the contrary. Estate of Gilford v. Commissioner,88 T.C. 38 (1987). Accordingly, we conclude that any firms competing for the license in an arm's-length negotiation in 1981 would have been willing to pay royalties much closer to 10 percent than to 3 percent. Respondent alleges that the royalty payments were tax motivated. However, we find little evidence of such motivation. For example, respondent alleges that the salaries of Belknap and Guebert fell at the same time that the royalty payments increased to 10 percent. In fact, however, total salaries (including commissions) had an upward trend during most of the years in issue. We also conclude that SDI would have been willing to pay a more substantial royalty for an exclusive license thus maintaining its monopoly position in the field. This is especially relevant in view of the previous *227 business disagreement between Belknap and Guebert. In the absence of an exclusive license, another business disagreement might have caused either Belknap or Guebert to license the product to another company, eliminating SDI's monopoly position. We hold that the 10-percent royalties were reasonable. Neely v. Commissioner,85 T.C. 934, 944 (1985); Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980). Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Snap-Drape, Inc., docket No. 5710-87; and Estate of Dorothy A. Guebert, Deceased, Gerald E. Guebert, Independent Executor, and Gerald E. Guebert, docket No. 6058-87.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the deficiency. ↩
3. A portion of this statement, as well as other statements in MSI's report, are identical to statements in various articles on the subject. For the most part, the MSI report does not attribute these statements to the articles from which they came.↩